·CHARLES C. BENNETT, Administrator, *vs.* SYNDICATE INSURANCE COMPANY and others.

September 24, 1888.

Master and Servant—Negligence of Master.—The rule as to the general duty of the master to exercise care to prevent the exposure of his servant to unnecessary and unreasonable risks, as laid down in *Cook* v. *St. Paul, M. & M. Ry. Co.*, 34 Minn. 45, applied to this case.

Same—Province of Court and of Jury.—As stated in *Abbett* v. *Chicago, Mil. & St. Paul Ry. Co.*, 30 Minn. 482, the question of negligence is, ordinarily, one for the jury, and always so when the evidence is conflicting, or when the facts are undisputed, but different minds might reasonably draw different conclusions from them. Under this definition the trial court was not warranted in directing a verdict for defendants in this case.

Appeal by plaintiff from an order of the district court for Hennepin county, *Young*, J., presiding, refusing a new trial.

*Merrick & Merrick*, for appellant.

*Hart & Brewer*, for respondents.

COLLINS, J. This action was brought to recover damages for alleged negligence, resulting in the death of Gustave Brown, the plaintiff's intestate. Upon the trial, after receiving all of the testimony, a verdict for defendants was ordered by the court, although it had,

when plaintiff rested his case, refused a nonsuit. The facts, as shown by the evidence before us, are as follows: The St. Anthony Elevator (so called) having been destroyed by fire, July 19, 1887, its contents, when so burned, (about 800,000 bushels of wheat,) were sold to defendants, who, upon July 30th, commenced to remove the same, employing a large force of laborers, among them the deceased. The building, an immense structure, 82 feet wide and 300 in length, rested upon a rubble-stone wall of the same dimensions, averaging 13 feet in height and from 18 to 20 inches thick, also upon posts, 12 by 12 inches, placed inside the wall upon proper footings, in groups of six, an inch apart across, and four inches lengthwise of the superstructure. These groups were three feet apart one way and six the other, well braced with each other, but in no manner connected with the wall. Both posts and wall were built as a substructure only, were not designed to resist lateral pressure, but simply to hold up and sustain the great weight of grain which might be stored in the bins above. With the burning of the elevator its contents fell to the ground, about the posts, and outside, as well as inside, the wall. The overflow of grain extended many feet around, in some places buried the wall out of sight, while at the point of the accident it reached the top, although some had been taken away when the deceased commenced work. The building had burned 11 days previously; it had rained several times; large quantities of water had been poured upon the wheat and walls; men were at work night and day attempting to subdue the fire; but the condition was such that the gangs of laborers would frequently have to move to escape the heat, which would prove unbearable, and at times the wheat could not be handled. When this occurred, those moving it would work elsewhere, while other men would pour on water, and in other ways seek to render the heat less intense. This, then, was the situation during the four days that deceased was at work. The testimony shows that the defendants made no attempt to learn the actual condition of the wall. Assuming that it was safe, although it had bulged out upon one side, they wholly failed to guard against its falling when the overflow should be removed from the outside, and took no steps to avert such a catastrophe anywhere along its lines. On the morning of August 3d Brown was killed, with sev-

eral other men, at a point upon the outside where nearly all of the wheat had previously been taken away, by the falling of about 30 feet of the wall. The stones which covered these unfortunate men were so hot that water had to be applied before the bodies could be removed, while the mortar had been so affected by the fire and water that it crumbled to dust when taken in the hand.

There is no claim in this case that plaintiff's intestate deliberately exposed himself to any unnecessary and unreasonable risk, whereby he might be charged with contributory negligence, or that he assumed the risk when he obeyed orders and began work under the wall. The court below, as we learn from the order refusing a new trial, placed such refusal upon what it claims was a total failure upon plaintiff's part to show negligence of defendants, or that the accident was due to neglect on their part to exercise reasonable and ordinary care and prudence when putting the deceased in what turned out to be a most dangerous place.

It is the general duty of the master to exercise care to prevent the exposure of his servant to unnecessary and unreasonable risks. He must use reasonable diligence in seeing that the *place* where the service is to be performed is safe for that purpose; and this duty, the master's liability to his servant, extends not only to such unnecessary and unreasonable risks as are in fact known to him, but to such as he ought to know, in the exercise of proper diligence. *Cook* v. *St. Paul, M. & M. Ry. Co.*, 34 Minn. 45, (24 N. W. Rep. 311.) The general rules upon negligence applicable to this case are well stated in *Abbett* v. *Chicago, Mil. & St. Paul Ry. Co.*, 30 Minn. 482, (16 N. W. Rep. 266.) Where the facts are undisputed or conclusively established, and there is no reasonable chance for drawing different conclusions from them, the question of negligence is for the court, as in any other case. But when the facts are such that fair-minded men of ordinary intelligence may differ as to the inferences to be drawn therefrom, or where the evidence upon material facts is conflicting, the question of negligence is for the jury; and it follows that, ordinarily, it is only where there is an entire absence of evidence tending to establish negligence that a court can enter upon the province of the jury, order a nonsuit, or direct the verdict for defendant.

These rules, applied here, lead to a reversal of the order. There was but little controversy over the facts in the case, but fair men, exercising ordinary intelligence when considering them, might easily arrive at different conclusions upon the question of defendants' negligence. The defendants were in possession of all the facts as to the magnitude and severity of the fire, the difficulty in controlling or subduing it. They knew that the foundation wall was not built to resist lateral pressure; that the groups of posts composing part of the foundation were upon fire; that large quantities of burning timbers were scattered through the grain, which was also briskly burning; that the action of the fire and water tended to disintegrate and weaken the wall; that, from some cause, it had already bulged out in several places; and it may well be argued that they should have realized the danger to workmen, the risk and hazard of attempting to remove the overflowed wheat, which sustained it upon the outside, without first taking the precaution of a thorough examination of the wall, and, unless fully assured of its safety, providing adequate means to keep it upright and intact. It was, then, for the jury to say whether, from the facts which were in defendants' possession, or which they might have learned by the exercise of proper diligence, that is, diligence proportionate to the occasion, the defendants took such precautions as prudent and careful men should take. Did they exercise due care to prevent exposure of their servants to an unnecessary and unreasonable risk? Did they exercise reasonable diligence to see that the place where the deceased was set to work was safe for the purpose? And in refusing to allow these matters to be passed upon by the jurors the court erred.

Order reversed.