BRUNSON VS SOUTHWESTERN DEVELOPMENT CO.

Opinion rendered September 26, 1907.

(104 S. W. Rep. 593).

1. *Trial—Court's Direction of Verdict.*
    Where the question is defendant's negligence, and plaintiff does not establish his negligence the court should direct a verdict in favor of the defendant.
2. *Master and Servant—Servant's Injuries—Providing Safe Place to Work.*
    The operator of a coal mine must use reasonable care to keep timbers properly set and in proper condition, and for this reason must provide competent mining boss to inspect timbers and walls.
3. *Negligence—Question of Law.*
    When facts are undisputed and such that but one conclusion can be drawn from them by reasonable men the question of negligence becomes one of law.
4. *Master and Servant—Servant's Injuries—Negligence.*
    A coal miner who had tunneled a room out for himself and had braced the roof with a bar in a workmanlike manner after it had fallen in thus rendering it reasonably safe was killed in his room by the falling of slate. Room had been regularly inspected by the foreman, and on the day before the accident was found without signs of weakness. The company was not negligent.

Error to the United States Court for the Central District of the Indian Territory; before Justice T. C. Humphrey, May 16, 1905.

Action by D. D. Brunson, administrator of Louis Gamerro, against the Southwestern Development Company. From a judgment for defendant, plaintiff brings error. Affirmed.

On June 30, 1904, the plaintiff, plaintiff in error here, filed his complaint against defendant, defendant in error here, and alleged that he is a citizen of the United States, and as the administrator for the widow and next of kin of Louis Gamerro, complaining of the defendant, the Southwestern Development Company, a foreign corporation, conducting a mining business in the Central Judicial district of the Indian Territory, having an agent at South McAlester, in said district, that on or about the 15th day of September, 1903, and at the time of the death hereinafter complained of, plaintiff's intestate was an employe of this defendant, by it engaged to mine coal in its No. 4 mine, near the town of Coalgate, Ind. Ter.; that on or about said date, and for a period of about three months immediately prior thereto, plaintiff's intestate had been digging coal as such employe in its said No. 4 mine, and in a room or place assigned to said plaintiff's intestate by its mine foreman or pit boss, that on or about the year 1901, at a point about one mile south of the town of Coalgate, Ind. Ter., the defendant sunk a shaft, which extends vertically from the surface of the earth to the coal stratum, a depth of about 150 feet, and at a distance of 75 yards, more or less, north of said shaft, the defendant has driven a slope, extending in an easterly direction and following the slope of said coal stratum; that said slope forms the principal passageway in said mine, and that the defendant has from time to time in the operation of its said mine driven from either side of said slope, in a northerly and southerly direction, and at about right angles with a line running parallel with the slope of said

coal stratum, entries, or passageways through which defendant moves the coal mined in said mine, and through which certain of its employes pass to and from their work; that there have been driven from either side · of said entries or passageways rooms, in which certain of defendant's employes mine or dig coal, and that each room has what is called a "neck," which is the opening from the entry into the room, and which is ordinarily about 12 feet in length, measuring from the edge of the entry; that said shaft, slope, entries, and rooms form the aforesaid No. 4 mine and that the work of sinking said shaft, and driving said slope and entries, was done prior to the time when plaintiff's intestate began work for defendant. Plaintiff says that after the opening of said slope, entries, and rooms rock and earth were and are prone to fall from the roof of said mine, and that it was defendant's duty, after said slope, entries, and rooms were driven, to exercise ordinary and reasonable care and precaution to shore up the roof over said slope and entries, and also the roof over the necks of said, rooms, and, further, that it was defendant's duty continuously during all that period of time during which the deceased was in defendant's employ, and until the death hereinafter complained of, to exercise ordinary and reasonable care, diligence, and precaution, to keep the roof over said slope and entries, and also the roof over the necks of said rooms, as aforesaid, reasonably safe and secure. Plaintiff says that his said intestate was engaged in digging coal in what was at that time room No. 2, adjacent to what was known as the "dip switch" of the fifth south entry in said No. 4 mine; that during the last several weeks during which the deceased was in the defendant's employ this defendant failed and neglected to exercise ordinary and reasonable care, diligence, and precaution to shore up the roof of the neck of said room, and also the roof of the entry at the opening into said room, and that, by reason of defendant's negligence and failure, the said roof remained

for a period of several weeks immediately preceding the death
herein complained of in a dangerous and unsafe condition.
Plaintiff further says that the defendant, during the period
of several weeks last above referred to, knew, or by the exercise
of ordinary and reasonable care, diligence, and precaution,
and by proper attention to its business, could have known,
that said roof was in a dangerous and unsafe condition.    Plaintiff
says that on or about the 15th day of September, 1903, plaintiff's
intestate, in discharging the duties of his said employment,
was obliged for a while to work and pass under the roof of
the entry at the opening into his said room, and also under
the roof of the neck thereof, and, while said intestate was so
working and passing thereunder, on said date great masses
of stone and earth from the roof of said entry, and from the
roof of the neck of said room, by reason of defendant's negligence
and failure to exercise ordinary and reasonable care and pre-
caution to make and keep the place a reasonably safe place
to work, fell with great force and violence upon said intestate,
and did then and there crush him to death; that in the month
of May, 1892, in the commune of Barone, in the kingdom
of Italy, plaintiff's intestate, Louis Gamerro, and his wife,
Louisa Gamerro, were married according to the laws of Italy;
that as a result of said marriage there were born to them two
children, named Antonio and Maria Gamerro, respectively,
eight and seven years old; that the said Louisa Gamerro was
at the time of and before the death of plaintiff's intestate
his lawful wife, and that the above named Antonio and Maria
Gamerro are the legitimate children of said Louis Gamerro,
plaintiff's intestate, and Louisa Gamerro, said intestate's
widow, and that the said above named children are the only
legitimate children of which said Louis Gamerro is the father.
Plaintiff says that on the 28th day of June, 1904, he became
and is now by virtue of letters of administration administrator
for the said widow and next of kin of the said Louis Gamerro,

and it is in the capacity of such administrator, and for the benefit of the said widow and next of kin of said Louis Gamerro, that plaintiff brings this suit; that said intestate at the time of his death was 34 years old; that he was strong, robust, and vigorous; that his earning capacity was from $75 per month to $90 per month; and that, by reason of his wrongful death because of the negligence and failure of this defendant to exercise ordinary and reasonable care, diligence, and precaution to provide and maintain for him a reasonably safe place to work, the said widow and next of kin of the said Louis Gamerro have been damaged in a large sum, to wit, $20,000, wherefore plaintiff prays judgment for said amount as damages, and for costs. On the 5th day of October, 1904, the defendant filed a demurrer to the foregoing complaint, on the ground that said complaint did not state facts sufficient to constitute a cause of action, which demurrer on the 13th day of February, 1905, was over-ruled by the court. On the 19th day of April, 1905, defendant filed its answer, and denies each and every allegation stated and set forth in plaintiff's complaint; and, further answering, defendant states that even if said intestate, Louis Gamerro, lost his life at the time and place and in the manner as alleged in said complaint, but all of which is denied, that same was not caused by any negligence on the part of this defendant, or of any of its agents, servants, or employes, but was caused solely by negligence on the part of the said Louis Gamerro; and, further answering, defendant states that the widow and next of kin of said Louis Gamerro are not citizens of the United States nor residents thereof, but are aliens and non-residents, and were such at the date of the alleged injury, and were such at the commencement of this action, and are such at this time, and have always been such, and by reason of these facts, if the allegations of the complaint are true, recovery in this action cannot be had, and asks judgment for its costs. On the 16th day of May, 1905, the case was tried before a jury, which

returned following verdict: "We, the jury, find the issues in favor of the defendant. A. W. Knox, Foreman." Judgment was rendered upon the verdict, and on May 19, 1905, motion for new trial was filed, which motion on the 25th day of May, 1905, was overruled, to which ruling plaintiff excepted and asked and was allowed 60 days to prepare and file bill of exceptions. On July 24, 1905, a petition for writ of error and assignments of error were filed and allowed, and case brought to this court.

*James R. Wood,* for plaintiff in error.

*Clifford L. Jackson* and *J. G. Rolls,* for defendant in error.

TOWNSEND, J. (after stating the facts as above). Plaintiff in error has filed six assignments of error, as follows:

"First. The court erred in giving to the jury, upon request of the defendant, the instruction embodied in plaintiff's first original assignment of error, to wit: 'I will say this, gentlemen of the jury, if you find from the testimony that the deceased did his own timbering and propping and that after undertaking to timber and prop his own room he failed to do that sufficiently or if he did it in an unskillful way and the injury occurred, then, of course, the defendant would not be liable under those circumstances.'

"Second. The court should have given to the jury, as requested by the plaintiff, the instruction embodied in the second original assignment of error, to wit: 'On the question of the deceased's knowledge of the condition of the situation, you are instructed that if you find from the testimony in this case that the deceased was an ordinary miner, without experience in watching or caring for roofs in slopes and entries and passageways in mines, the fact that he might have seen, or the fact that he knew, that there were defects in the roof of the mine where he was killed, will not defeat plaintiff's ight to recover, unless a reasonably prudent and intelligent

man, under circumstances like those surrounding the deceased, would have known and realized and appreciated the dangers which those defects indicated.'

"Third. The court should have given to the jury, as requested by plaintiff, the instruction covered by plaintiff's third original assignment of error, to wit: 'The court instructs you that if you find from the evidence in this case that the deceased was engaged as a coal digger in the defendant's mine, whatever may have been the deceased's duty with reference to timbering the roof of the rooms and chambers from which he removed the coal, it was the defendant's duty, after the mine was once opened up and timbered, to exercise ordinary care and diligence to see that the timbers were properly set, and to keep them in proper condition and repair, and for this purpose it was the defendant's duty to exercise ordinary care and diligence to provide a competent inspector to make timely inspections of the timbers, walls, and roof of the mine, to the end that the deceased might not be injured by defects or dangers which a competent inspector would discover and remove.'

"Fourth. The court should have given to the jury, upon plaintiff's request, the instruction covered by plaintiff's sixth original assignment of error, to wit: 'It is contended by the defendant that the proof shows that the deceased negligently erected the timbers supporting the roof of the mine at the place where he was killed, and that he thereby became the author of his own misfortune. As to that feature of the case, the court instructs you that even though the deceased did negligently erect such timbers, should you find that he did, if you find that the defendant knew or could, by the exercise of ordinary care and prudence, have known of such negligence on the part of the deceased, and if you find that the defendant, after it knew or ought to have known of the negligent manner in which such timbers had been erected, could, by the exercise of ordinary care and precaution, have

avoided the injurious consequences of the deceased's negligence, then such negligence on the part of the deceased will not defeat plaintiff's right to recover in this action.'

"Fifth. The court should have given to the jury, upon plaintiff's request, the instruction covered by plaintiff's seventh original assignment of error, to wit: 'In this case the plaintiff, to recover of the defendant the loss that has been sustained by the deceased's widow and next of kin, charges the defendant with having negligently failed to. perform its duties in the matter of providing and maintaining for the deceased a reasonably safe place to work, and the defendant, to . defeat the action, says that the deceased, in going into the place, and continuing to work therein, with the knowledge which he had acquired of the condition of the roof at and about the mouth of his room, failed to exercise that care for his own safety that an ordinarily prudent and intelligent man, as a miner, under similar circumstances, and in a like situation, would have used. So there are in this case a charge and a countercharge of negligence. Negligence, the court instructs you, is a relative term. What could and should be regarded as gross negligence in one person would not be even negligence in another. The conduct of a certain individual in doing a certain thing, or in going into a certain place, might, without question, be regarded as negligence, while the same conduct of a different individual in doing the same thing, or in going into the same place, would be negligence, the difference arising from the inequality of the competency of the two individuals to know and to understand and to appreciate the condition of the situation. Then, in your efforts to determine whether or not the defendant and the deceased, or either of them, were negligent in the discharge of their respective duties in and about the place where the deceased was killed, it will be your duty to consider their respective capacities to know and to understand and to appreciate the condition of the roof of the mine

where the accident happened. Was the defendant's conduct, with regard to the place in its mine where the deceased was killed, such conduct as an ordinarily prudent and intelligent employer would have had, having the knowledge which the defendant had of the condition of the roof in its mine, and having the experience which the defendant had had in the operation of the same? And did the deceased, by going into the place, and by continuing to work therein, after having acquired the knowledge which he had of the condition of the roof, thereby commit an act which an ordinarily prudent and intelligent miner, in a like situation, and under similar circumstances, would have refrained from doing? These are questions for you to answer.'

"Sixth. The court should have given to the jury, upon the request of the plaintiff, the instruction covered by plaintiff's eighth assignment of error, to wit: 'The court instructs you that if you find from the evidence in this case that the deceased recklessly and heedlessly exposed himself to a known danger, the plaintiff cannot recover; but you are instructed that the dangers from the roof at the place where he was killed, and not the defects merely, must have been so obvious and threatening that a reasonably prudent man, as a miner, in a like situation, and under similar circumstances, would have avoided them in order to charge the deceased with such negligence as would defeat this action. And in this same connection, if you find that the deceased was an ordinary miner, without experience in watching and caring for roofs in mines, the court instructs you that in your deliberations to determine whether or not the conduct of the deceased in going into the place where he was killed, and in continuing to work therein, was such as to defeat the action, it will be your duty to consider the inequality between the competency of a man skilled and experienced in caring for and watching roofs in mines and the competency of a man with only the

experience of an ordinary miner. A skillful and competent inspector or mine foreman, such as the defendant was required to provide for the proper inspection and care of the roof in its mines, would realize and apprehend and foresee great and unusual dangers from a defective place in the roof, while an ordinary miner, without such experience and competency, might not know and appreciate the dangers entailed in such defects.' "

The first error assigned is the charge of the court given upon request of defendant, and which plaintiff in error says is his "principal and most serious complaint," because "knowledge, or want of knowledge, is one of the things that make negligence a relative term. Knowledge, or the want of it, is one of the distinguishing marks used in the determination of the question of negligence." This is discarded by the instruction, as "it declared, in effect, that the deceased's act of once making repairs in the place as a precautionary step to protect himself from danger constituted him, and he should forever afterwards remain, the absolute guarantor of his own safety. It stood without any qualification as to what knowledge the deceased or others had or might have had of the condition of the place after the repairs had been made." The court, in giving that charge, "quit the realm of negligence, and told the jury, in effect, that, if the deceased did the work of propping and timbering, and that if after undertaking to do it he failed to do it 'sufficiently' or failed to do it in a 'skillful way,' such failure on his part would prevent for all time to come a recovery for an injury befalling him at that place. These are terms that have not yet been adopted by the courts and made applicable to the law of negligence or of contributory negligence. The term 'sufficient' is absolute. The term 'negligence' is relative. It has a flexible nature. Acting upon the requested instruction, which if given would have been clearly erroneous, the jury could probably have gotten to

the issues in the case and have arrived at a proper verdict but with the instructions given in answer to the request it was impossible for them to even approach a consideration of the question as to whether or not the deceased and the defendant in error, or either of them, were negligent, the real issue in the case."

There can be no doubt that the real question in the case is one of negligence, and, further, that in the first instance the burden of proving negligence rests upon the plaintiff; and, if the plaintiff fails to establish any negligence, it is unquestionably the duty of the court not to submit the case to the jury at all, but to direct a verdict for the defendant. In Patton vs T. & P. Ry. Co., 179 U. S. 658, 21 Sup. Ct. 275, 45 L. Ed. 361, Judge Brewer, in delivering the opinion of the court, said: "That there are times when it is proper for a court to direct a verdict is clear. 'It is well settled that the court may withdraw a case from them altogether, and direct a verdict for the plaintiff or the defendant, as the one or the other may be proper, where the evidence is undisputed, or is of such conclusive character that the court, in the exercise of a sound judicial discretion, would be compelled to set aside a verdict returned in opposition to it. Phoenix Ins. Co. vs Doster, 106 U. S. 30, 32, 1 Sup. Ct. 18, 27 L. Ed. 65; Griggs vs Houston, 104 U. S. 553, 26 L. Ed. 840; Randall vs Baltimore & Ohio Railroad, 109 U. S. 478, 482, 3 Sup. Ct. 322, 27 L. Ed. 1003; Anderson County Commissioners vs Beal, 113 U. S. 227, 241, 5 Sup. Ct. 433, 28 L. Ed. 966; Schofield vs Chicago & St. Paul Railway Co., 114 U. S. 615, 618, 5 Sup. Ct. 1125, 29 L. Ed. 224.' Delaware, etc., Railroad vs Converse, 139 U. S. 469, 472, 11 Sup. Ct. 569, 35 L. Ed. 213.   See, also, Aerkfetz vs Humphreys, 145 U. S. 418, 12 Sup. Ct. 835, 36 L. Ed. 758; Elliott vs Chicago, Milwaukee, etc., Railway, 150 U. S. 245, 14 Sup. Ct. 85, 37 L. Ed. 1068." The court says that cases are not to be lightly taken from the jury; "hence it is seldom

that an appellate court reverses the action of a trial court in declining to give a peremptory instruction for a verdict one way or the other. At the same time, the judge is primarily responsible for the just outcome of the trial. He is not a mere moderator of a town meeting, submitting questions to the jury for determination, nor simply ruling on the admissibility of testimony, but one who in our jurisprudence stands charged with full responsibility." And in case of an action for damages by an employe     "*     *     *     it is not sufficient for the employe to show that the employer may have been guilty of negligence. The evidence must point to the fact that he was. And where the testimony leaves the matter uncertain, and shows that any one of half a dozen things may have brought about the injury, for some of which the employer is responsible and for some of which he is not, it is not for the jury to guess between these half a dozen causes and find that the negligence of the employer was the real cause, when there is no satisfactory foundation in the testimony for that conclusion. If the employe is unable to adduce sufficient evidence to show negligence on the part of the employer, it is only one of the many cases in which the plaintiff fails in his testimony, and no mere sympathy for the unfortunate victim of an accident justifies any departure from settled rules of proof resting upon all plaintiffs." In C. & N. W. Ry. Co. vs O'Brien, 132 Fed. 596, 67 C. C. A. 421, the court said: "The burden of proof is upon him who asserts that the employer was negligent. This burden cannot be discharged by mere proof of the occurrence of the accident." The court in this case quoted with approval the following: "In Wormell vs Railroad Co., 79 Me. 397, 10 Atl. 49, 1 Am. St. Rep. 321, the court said: 'There is no presumption of negligence on the part of the defendant from the fact alone that an accident has happened, or that the plaintiff has received an injury while in the employment of the defendant.' " In 1 Sutherland

on Damages (3d Ed.) § 3, it is said: "Sec. 3. 'Damnum absque injuria; injuria sine damno.' The right to damages constituting a legal cause of action requires the concurrence of two things: That the party claiming them has suffered an injury; and that there is some other person who is legally answerable for having caused it. If one suffers an injury for which no one is liable, it gives no legal claim for damages. It is damnum absque injuria." In Watson on Damages, § 2, it is said: "Sec. 2. 'Damnum absque injuria.' Where there has been no violation of a right, the situation is described as damnum absque injuria, in which circumstances a recovery is not permitted, no matter to what extent the plaintiff may have sustained damages. 'One cannot always look to others,' it has been said, 'to make compensation for injuries received. Many accidents occur, the consequences of which the sufferer must bear alone.'" It is therefore necessary to examine the evidence in this case on behalf of plaintiff to ascertain if there is proof of the negligence of the defendant, which, under the law, makes the defendant liable in damages. If the plaintiff in error has failed in that respect, it becomes wholly immaterial whether the court in its instructions to the jury declared the law correctly or otherwise, as in that event the requested instruction of the defendant should have been submitted, and the jury directed to return a verdict for defendant.

Before examining the evidence, let us see what duties and obligations under the law were imposed upon the defendant in this case. In Western Coal & Mining Co. vs Ingraham, 70 Fed. 219, 17 C. C. A. 71, from the Circuit Court of Appeals, Eighth Circuit, the court said: "The issue was whether the defendant had discharged its duty to the plaintiff in furnishing him with a reasonably safe place in which to work. The mine had been timbered long before the plaintiff went to work therein, and the accident resulted from a defect in that timbering.

It is not claimed that the plaintiff had anything to do with this timbering, or that it was any part of his duty to inspect or repair the same. Whatever may be the duty of coal miners with reference to timbering the slopes and roofs of the rooms from which they remove the coal, the rule is well settled that, after a mine is once opened and timbered, it is the duty of the owner or operator to use reasonable care and diligence to see that the timbers are properly set, and keep them in proper condition and repair. For this purpose, it is his duty to provide a competent mining boss or foreman to make timely inspections of the timbers, walls, and roof of the mine, to the end that the miners may not be injured by defects or dangers which a competent mining boss or foreman would discover and remove. This is a positive duty which the master owes the servant. A neglect to perform this duty is negligence on the part of the master." In the case just cited: "The mine had been timbered long before the plaintiff (Ingraham) went to work therein, and the accident resulted from a defect in that timbering. It is not claimed that the plaintiff had anything to do with this timbering, or that it was any part of his duty to inspect or repair the same." In Union Pac. Ry. Co. vs Jarvi, 53 Fed. 65, 3 C. C. A. 433, the court said: "It is the duty of the employer to exercise ordinary care to provide a reasonably safe place in which his employe may perform his service.     *     *     *     It is his duty to use diligence to keep this place in a reasonably safe condition, so that his servant may not be exposed to unnecessary and unreasonable risks. The care and diligence required of the master is such as a reasonably prudent man would exercise under like circumstances in order to protect his servants from injury. It must be commensurate with the character of the service required, and with the dangers that a reasonably prudent man would apprehend under the circumstances of each particular case.     *     *     *     For a failure to exercise this

care, resulting in the injury of the employe, the employer is liable; and this duty and liability extend, not only to the unreasonable and unnecessary risks that are known to the employer, but to such as a reasonably prudent man in the exercise of ordinary diligence—diligence proportionate to the occasion—would have known and apprehended.   Cook vs Railroad Co., 34 Minn. 45, 24 N. W. 311; Hayden vs Manufacturing Co., 29 Conn. 548; Noyes vs Smith, 28 Vt. 59, 65 Am. Dec. 222; Gibson vs Railroad Co., 46 Mo. 163, 2 Am. Rep. 497; Nadau vs Lumber Co., 76 Wis. 120, 43 N. W. 1135, 1137, 20 Am. St. Rep. 29; Hutchinson vs Railroad Co., 5 Exch. 343; Huddleston vs Machine Shop, 106 Mass. 282; Snow vs Railroad Co., 8 Allen (Mass.) 441, 85 Am. Dec. 720; Sullivan vs Manufacturing Co., 113 Mass. 396; Ryan vs Fowler, 24 N. Y. 410, 82 Am. Dec. 315; Patterson vs Railway Co., 76 Pa. 389, 18 Am. Rep. 412; Swoboda vs Ward, 40 Mich. 420.   .*     *     * While the master is not a guarantor or insurer of the safety of the place in which he puts his servant, or of the safety of the tools or machinery which he furnishes, he is in every case bound to exercise that care and diligence proportionate to the occupation and the occasion which a reasonably intelligent and prudent man would use under like circumstances  both to provide and keep in reasonably safe condition the  place of work and the machinery and appliances requisite to its performance.     *     *     *     On the other hand, it is the duty of the servant to exercise that degree of care, commensurate with the character of his occupation and the occasion, which a reasonably prudent person would employ under like circumstances in order to protect himself from injury; and, if he fails to exercise this care, he cannot recover of the master for an injury to which his own negligence has contributed even though his master has failed to exercise due care on his part.   He cannot recklessly expose himself to a known danger, or to a danger which an ordinarily prudent and intelligent

man would, in his situation, have apprehended, and then recover of the master for an injury his own recklessness has caused. Cunningham vs Railway Co. (C. C.) 17 Fed. 882, 886; Bunt vs Mining Co., 138 U. S. 483, 485, 11 Sup. Ct. 464, 34 L. Ed. 1031; Railroad Co. vs Jones, 95 U. S. 439, 443, 24 L. Ed. 506; Kane vs Railway Co., 128 U. S. 91, 94, 9 Sup. Ct. 18, 32 L. Ed. 339; Goodlett vs Railroad, 122 U. S. 391, 411, 7 Sup. Ct. 1254, 30 L. Ed. 1030; Kresanowski vs Railroad Co. (C. C.) 18 Fed. 229, 234, 235; Railroad Co. vs Nickels, 4 U. S. App. 369, 1 C. C. A. 625, 50 Fed. 718; Railroad Co. vs Davis, 53. Fed. 61, 3 C. C. A. 429." The court in this last case states the rule that controls, whether it is a question for the jury or the court, as follows: "The ordinary care which the parties are required to use in the discharge of their respective duties to each other so varies with the situation of the parties and the circumstances of each particular case, the measurement of it depends so much upon knowledge and experience of practical business affairs, that the policy of the law to relegate these questions to the determination of 12 practical men has long been settled. It is only when the facts are undisputed, and are such that reasonable men can fairly draw but one conclusion from them, that the question of negligence is ever considered one of law for the court. Railway Co. vs Ives, 144 U. S. 409, 417, 12 Sup. Ct. 679, 36 L. Ed. 485; Railway Co. vs Converse, 139 U. S. 469, 11 Sup. Ct. 569, 35 L. Ed. 213; Railroad Co. vs Pollard, 22 Wall. (U. S.) 341, 22 L. Ed. 877; Bennett vs Insurance Co., 39 Minn. 254, 39 N. W. 488; Abbott vs Railway Co., 30 Minn. 482, 16 N. W. 266." While the facts in the foregoing cases are not the same as in the case at bar, yet it is believed the principles laid down control this case, and, both being decisions of the Eighth Circuit, are controlling so far as this court is concerned. The bill of exceptions contains all the evidence and we here set forth all testimony bearing on the negligence of either

either party. Ed. Watkins testified: "Q. Tell whether or not you remember the instance of the falling of the roof and the killing of Louis Gamerro in the company's mine in the fall of the year 1903? A. State what I know about it? Q. Yes; state whether or not you know anything about it? A. Yes, sir; I was right alongside of him when he was killed. Q. What were you doing? A. I was driving a mule. Q. What did you have hitched to the mule? A. I had three cars. Q. What did you do with those cars? A. I went to make the trip out of the top entry into the back entry with the three empty cars. I took them down into the back entry and delivered one car at No. 1 room, and the mule went on by No. 2 room where Gamerro was working. I hollered down to uncouple the car and delivered the car, and I saw Gamerro— Q. Where was this, right at the mouth of the room? A. Yes, sir; right in front of mouth of the room I saw Gamerro standing at the switch. I started the mule with the car. Just then I started it up and a rock struck me on the head and shoulder, crushing me to the high side of the rib. The heavy part of the rock fell back in the switch where he was. By the Court: Was that on an entry, or the roof of the room? A. The mouth of the room where he got killed. Q. The mouth of the room was where it fell, was it? A. The edge of the rock come on the right side of the entry where I was standing. By Mr. Wood: Q. You were on the opposite side of the cars from him? A. Yes; I was on the entry, and he was in the room. Q. How far was he from you at that time? A. He was the width of the car and about three feet inside the switch. Q. You had been along there several times that day? A. I had been in that room three or four times that morning; pulled three or four cars from it.    *    *
Q. Now, in going into the rooms, you always watched to see if there was any danger, did you? A. Well, I always noticed. Q. Had you noticed any dangerous condition

of the room in going out and in there that day? A. Not any more than any other day. Q. This rock, then, that killed Gamerro, fell straight down about three feet back from the entry, and caught him while he was standing there, and then slipped off, did it, out into the entry? A. Yes, sir. Q. Now, I will ask you if it is not a fact that you had not noticed anything unusual about the place where Gamerro was working that morning? A. No; I had never noticed anything strange around there that morning. Q. I will ask you if it isn't a fact that there was nothing there that led you to believe that there might be a fall going to happen? A. No, sir. Q. You saw nothing of that kind? A. No, sir; nothing of that kind. Q. You saw no indications of danger there, did you, that morning? A. No, sir; not that morning. Q. And you always kept a close lookout for signs of danger, didn't you? A. Yes, sir; I always tried to."

J. W. Alexander testified: "Q. State whether or not you knew Louis Gamerro? A. I knew him when I saw him. I was not personally acquainted with the man. Q. State whether or not you and he were in the same entry? A. He worked on the same entry that I worked in. Q. What entry was that? A. It was the fifth south. Q. What did Louis Gamerro do, if you know? A. He dug coal. * * * Q. State to the court and to the jury whether or not you remember the incident of a fall from the roof at the mouth of that room prior to the time of the accident in which he was killed? A. There was a fall of top coal, or what they term 'boney,' that was on the entry, that fell prior to his being killed. Q. Do you remember the incident? Do you remember seeing the coal, the boney, there? A. Yes, sir. * * * Q. Did you say anything to the deceased Gamerro about the place before he died? A. Yes, sir. Q. Was it after the fall? A. Yes, sir; I was there the morning when the top coal fell. Q. You saw him? A. Yes, sir. Q. Tell

the jury what you said to him, if anything? A. I told him he had better put a bar at that place in order to steady or hold the roof. Q. How long was it now after this timbering was put up until the accident in which Gamerro was killed, if you remember? A. I don't remember exactly how long it was. Q. About how long? A. Well, it was somewhere between I expect 15 days, 12 or 15 days, or a month, perhaps longer; I couldn't say as to that.    *    *    *    Q. Now, state to the jury whether or not from such experience you considered that place reasonably safe and secure and adequately timbered and sufficiently timbered. A. I considered it reasonably safe for the time being. While I didn't consider it timbered sufficiently, it was not timbered in the way it should have been.    *    *    *    Q. After the bar was put in there you didn't pay much attention to the place, did you? A. I made no special examination of it; no, sir. Q. After that was put in you considered it to be safe, temporarily? A. Reasonably safe. Q. Now, when you called Gamerro's attention to the condition, he put in a bar in a good workmanlike manner, did he not? A. Yes, sir. Q. Now, it was where that bar was put in that he was killed, wasn't it? A. Yes, sir.    *    *    *    Q. Did you ever put in any of these cross-bars yourself? A. Yes, sir. Q. Did you ever put any in, in that mine out there? A. Yes, sir. Q. What did the company pay you when you would put those in? A. 33⅓ cents, I think. Q. Were you digging coal at the time you put them in? A. Yes, sir. Q. Put them in your room? A. In the entry; yes, sir. Q. When you would find there was any danger there you would put in a cross-bar, and, when it came pay day they would pay you 33 cents for each one, did they? A. Yes, sir.    *    *    *    Q. It is not infrequent for them to put up their own bracings who are digging coal? A. No, sir; they frequently do. The men who are working the place.

Q. They either do that themselves or call the timber man and have him do it? A. Yes, sir. Q. If the timber man does it, the coalman gets no pay for it, but, if the coal digger puts it in, he gets pay for it? A. Yes, sir. Q. Then it is optional with him whether he does it himself or calls the timber man? A. Yes, sir."

Joe Buendi testified: "Q. State whether or not you had passed through that place before. A. I worked right close to him, next room. I passed there three or four times every day. Q. What did you do, Joe? A. Digging coal. * * * Q. The room that he was killed in is the room that he had turned off, and was the next one to yours? A. Yes, sir. Q. You got there first, you got the first room, he got there next and he got the second room? A. I got there first, he got there next. * * * Q. He would go into your room sometimes? A. Yes, sir. Q. Did you help him put that timber in the neck of his room? A. I hold. He put the braces. Q. You held up the brace while he put it in? A. Yes, sir. Q. That was a good prop you put in there? A. Yes, sir; it was an awful big prop. Q. He had put a prop under one end of it, had he? A. Yes, sir. Q. And cut the other so it would go into the coal on the lower side? A. Yes, sir; because the prop was not long enough. * * * Q. He knew how to put in props and to dig coal? A. And kept the room in good shape. Q. He understood that kind of work and put that prop in there in good shape? A. Yes, sir; I am sure it was good. Q. You saw it done, saw him do it? A. Yes, sir. Q. When the coal diggers put these bars and props in, they get—was it 33 cents apiece for putting them in? A. Yes, sir; they get that much now. I don't remember if he got the pay at that time or not. Q. That was the rule, when the miners put them in themselves, they got 33 cents apiece for them? A. Yes, sir. * * * By the Court: Q. Before

this injury occurred, who would put up these timbers in the rooms where timbers were put up, who would put them up, the men that were working in the rooms, or somebody else? A. The men that was working in the rooms."

Frank Buendi testified: "Q. Did you know Louis Gamerro during his lifetime? A. Yes; I knew him about five years ago in Colorado. Q. What kind of work he did? A. Digging coal like me too."

William Cameron testified: "Q. What is your official position? A. United States Mine Inspector. Q. How long have you held that position? A. About three years and a half.    *    *    *    Q. Were you at the room, the place where he [Gamerro] was killed? A. I was two days afterwards. Q. Did you examine the condition of the mouth at that point? A. Yes. Q. Mr. Cameron, just state what you found in regard to how it occurred, and what indications there would be prior to the occurrence of it. A. I found that a large rock had fallen out, leaving a cavity in the roof on each side, on the upper side, and lower side of that rock there were two slits running in a V-shape and the condition previous to that I couldn't see, because I hadn't examined it, but the condition might be that that would be examined, and it would be impossible to discover these slits which caused the rock to fall. Q. The slits had commenced at the bottom the way it appeared, and came together in a V-shape? A. Yes; one had commenced in the entry and the other right inside of the neck of the room probably 18 inches or 2 feet, and the two met probably 2½ feet high, and this large rock being relieved by these two slits it fell out. Q. You don't know from the fall of that, and an examination from the surface prior to the falling would not have developed or would not have enabled a person to discover the falling? A. It might not. Those things occur on many occasions

when a very close inspection didn't agree with it, don't discover it."

A. B. Cameron testified: "Q. What were you doing at that time for the company? A. I was mine foreman. * * * Q. Was there anything there to prevent the fall at that particular place? A. Yes, sir; there was one nine-foot prop. Q. Who put the prop in there? A. Gamerro himself. Q. He was a practical miner, was he? A. Yes, sir; he was a good average miner, Gamerro was. * * * Q. As foreman of the mine what did you have to do with reference to inspecting the rooms? A. To see that they were properly timbered. Q. You noticed that timber there did you? A. Yes, sir; when I paid for it. Q. You paid Gamerro for putting it in there? A. Yes, sir. Q. State now whether it was put in there properly? A. The bar was put up in a proper workmanlike manner. Q. In inspecting did you notice to see if the rooms were properly timbered? What did you do, would you notice the roof? A. First thing is to take into consideration what kind of a room you have got and what props you require. All the roof is not alike. Q. Where this bar was in as I understand it is where this fall occurred. Now when you inspected that, was there anything to indicate there that a fall was likely to occur? A. When we put up that bar, the roof was a little loose. Q. Is that why the bar was put up there? A. Yes, sir. Q. After the bar was put up there, did that make that in a safe condition? A. Yes, sir, it made it in a safe condition as far as we could determine. * * * Q. Were you there the day before the accident? A. I would judge from the dates that I was certainly in that man's place and room two days previous to his death. Q. Now, at that time, did you notice his room at the time? A. Yes, sir; I noticed all the rooms. Q. Did it appear to be in perfect condition? A. Appeared to be in perfect condition, the roof. Q. The

roof appeared to be all right, did it?  That is what you reported it?  A.  Yes, sir.  Q.  In speaking of the bar that was put there, who puts those bars up there?  A.  The miners very often puts the bars up, and the timberman they put up others. Q.  Have the miners the privilege of putting up their bars if they like?  A.  Why, certainly, they have a contract with the company for payment for putting them up.  Q.  How much are they paid for putting them up?  A.  At that time they were paid 33 cents.  Q.  That was part of the contrac of the employes was it?  A.  Yes, sir.  By the Court:  Q. I would like to ask right there, do you mean to state that they were to put up these timbers or were they to use their option, could put them up if they wanted to or the company would put them up?  I want to find out from you whose business it was to put these timbers up?  A.  There was nothing to make it compulsory with the miner to put them up.  Q.  If the miner didn't put it up and you inspected it, and saw it had to be put in, you would do it? A.  Yes, sir.  Q.  And if the miner wanted to put it up and saw it needed putting up he would have to put it up and wait on you for pay?  A.  Yes, sir; and they would get paid for it on the regular pay day for work.    *    *    *    Q. After that timber was put up there was there anything there to indicate there was any danger after it was already placed there?  A.  No, sir.  Q.  Appeared to be safe, did it?  A. Appeared to be safe.    *    *    *    Q.  Could you tell by a close examination, inspection of the roof timbers, whether or not the same was properly timbered, sufficiently and adequately timbered?  You are a mine foreman.  A. Yes, sir; without any trouble.  Q.  Was that place properly, sufficiently, and adequately timbered?  A.  Yes, sir.  Q.  You say it was?  A.  Yes, sir; I say it was."

G. W. Easter testified: "Q.  Were you there the day before?  A.  Yes, sir.  Q.  Did you notice the room?  A.

Noticed the place that fell, where they said he got killed at. Q. Did you notice any timbering that had been done there? A. Yes, sir; some timber there. Q. Do you know who put that timber there? A. No, sir. Q. What were your duties there? A. To examine the roof. Q. Did they call you the timberman? A. Yes, sir. Q. The day before this did you examine the top of this room, where he was killed? A. Yes, sir. Q. Was there anything to indicate that there was any danger? A. No, sir; no more than they had been theretofore been putting timber there. Q. You saw no evidence of danger then than that for which the timber was placed there? A. Yes, sir; that is all. Q. Was that timber there properly placed? A. Yes, sir; in good condition. * * Q. When did you examine this place last before the accident? A. The day before. Q. And you found then that it was free from any signs of weakness? A. Yes, sir. Q. Free from any indications of danger? A. Yes, sir. Q. And you found that there were no breaks in the roof? A. No more than on the inside of the room, where the timber had been put. There was a broken place on the inside of the room that the timber had been put up there to hold the top up and to indicate any fall. Q. Did you make a statement to Mr. William Cameron, the mine inspector, about this matter? A. At the time? Q. Pretty soon after the accident? A. I suppose so; yes, sir. Q. Did you state to him that you had timbered in this mine, and had examined this entry the day previous to the accident, and found the same in good condition so far as you could discover by careful examination? A. Yes, sir. Q. You stated that there was one cross-bar about the center of the rock that fell, and no appearance of crack or weakness that you could discover in the vicinity of where the rock had fallen—did you tell him that? A. Yes, sir. Q. It was your duty to go around there and examine these timbers every day? A. Yes, sir. Q. And

you did do it? A. Yes, sir. Q. And you examined the walls and roof of the mine as well? A. Yes, sir. Q. You examined that every day? A. Yes, sir."

From the foregoing testimony, it is difficult to locate any negligence on the part of either the plaintiff or defendant. Gamerro had turned off the room himself in which he was working, and after the fall of the substance called "boney" he placed a bar at that point to support the roof, and the testimony of every witness is that it was thereafter reasonably safe, and the timbers were placed in a good and workmanlike manner. The miner had the option to place such timbers as were needed, and receive pay for the same, or to call upon the timberman to put up the timbers. Cameron, the foreman, inspected the room, and the timbering of Gamerro, and says it was properly, sufficiently, and adequately timbered. The timberman examined the place the day before the accident, and it was free from any sign of weakness. We cannot discover any negligence on the part of the defendant, neither was there any contributory negligence by the plaintiff, shown by the proof, and all argument and citation of authorities about contributory negligence or assumption of risk is mere speculation. We have no doubt the jury, in returning a verdict for the defendant, took that view, and that the unfortunate accident resulting in Gamerro's death was one that human foresight could not guard against, and no negligence could be attributed to any one.

In our judgment the court, under the proof, should have directed a verdict for defendant, and that, therefore, it is not necessary to consider the other assignments of error. Hence, as the jury has decided for the defendant, let the judgment of the court below be affirmed.

GILL, C. J., and CLAYTON and LAWRENCE, JJ., concur.